**Susan Boone SPINOLA, Plaintiff,**

v.

**COSTA LINE, INC., Defendant.**

**Civ. No. 84–1053 (JP).**

United States District Court,
D. Puerto Rico.

June 19, 1985.

Harry A. Ezratty, San Juan, P.R., for plaintiff.

Jimenez & Fuste Law Offices, San Juan, P.R., for defendant.

### OPINION AND ORDER

PIERAS, District Judge.

This is an action founded on the admiralty and maritime jurisdiction of this Court,

28 U.S.C. § 1333. Plaintiff seeks damages allegedly sustained on November 19, 1983, when as a passenger aboard the cruise vessel "CARLA C", she claims to have been sexually molested.

The matter was tried to the Court on February 4, 1985. At Trial, through their witnesses, the parties stated their case as follows:

I.  PLAINTIFF'S CASE:

Plaintiff, Susan Boone Spinola, is a twenty-five year old woman from Tampa, Florida. She has an eleventh grade education and since leaving school has worked mostly as a cocktail waitress. In September of 1983 she began work as a cocktail waitress aboard the passenger vessel "CARLA C" during this vessel's Caribbean tour. According to her testimony she disembarked, or left the ship, on October 30, 1983. A short time after leaving the vessel, she married, in San Juan, the bartender with whom she worked aboard the "CARLA C", one Daniele Spinola. She was together with Spinola for one week after their marriage, and thereafter she saw him once a week when the vessel was in San Juan.

On November 18, 1983, plaintiff, together with one Judith Scolovino, purchased tickets as passengers for a one night cruise aboard the "CARLA C". Judith Scolovino, a witness who testified on behalf of plaintiff, had also been employed aboard the "CARLA C" for some eight months as a cocktail waitress/wine stewardess. Both women left San Juan by plane on November 18 for St. Thomas, U.S. Virgin Islands. The cruise for which the two women had booked passage left St. Thomas that evening and arrived in San Juan the next day in the early morning. They paid $150.00 to travel in the "CARLA C" from St. Thomas to San Juan.

Plaintiff's husband, Daniele Spinola, who was still employed on the vessel on November 18, 1983, did not know that plaintiff would be boarding as a passenger.

After boarding the vessel at St. Thomas, plaintiff and Scolovino left their luggage at the ship and went to the beach for the remainder of the afternoon. Both returned to the ship, changed clothes, and had supper together at about seven o'clock. Boone Spinola spent the remainder of the evening lounging in the bars aboard the ship, watching her husband work, visiting the casino, and just generally talking to people. She further testified that she had very little alcohol consumption, apart from the glass or two of wine she had at dinner. That night plaintiff did not spend much time with her traveling companion Scolovino but, sometime around 12:30 a.m., met her at their cabin. At this time, Scolovino was in the cabin with two other females, identified as "Sherry and Karen", and one male, whose name was not remembered. These persons were talking, drinking champagne, and listening to music. After this meeting, plaintiff returned to the bar areas, and Scolovino remained in the cabin with the other persons.

Plaintiff testified that she returned to her cabin sometime around 3:30 a.m. to change and go to sleep and that her husband, Spinola, had gone to his own cabin in the crew section of the ship. At plaintiff's return, her companion, Scolovino, was already in the cabin sleeping. Plaintiff changed and then proceeded to go to sleep. Both plaintiff and Scolovino remembered the cabin as being very dark.

It is at this point that the incident upon which the complaint is grounded allegedly took place. According to plaintiff's testimony, during the time plaintiff was sleeping, she realized the presence of a man in her bed. Plaintiff testified that she felt half awake, half asleep. During this time, she believed the man in her bed was her husband, Daniele Spinola. Plaintiff stated that the person in her bed took off her underwear, removed her "Tampax" (plaintiff was in her menstrual period), and performed cunnilingus on her.

Scolovino's testimony was to the effect that during the night she awoke noticing a man kneeling at plaintiff's bedside. Scolovino heard moaning and noises like "shush", and "no no" in a low tone of

voice, but thought nothing of it because she also believed, and "was sure" that this other person was plaintiff's husband, Daniele Spinola.

Sometime after cunnilingus was over and when the man was then laying next to her in bed, plaintiff testified she came to the realization that the person who was in bed with her was not her husband. After realizing this, plaintiff then told the person to "get away", whereupon the person stood up, and left. At the moment this person opened the door, the cabin companion, Scolovino looked over and, with the aid of the light from the hallway, identified this person as one "Franco", a cabin steward aboard the vessel. They had seen him during the day and, because of his clothes, identified him as a cabin steward.

According to plaintiff's testimony, a short time after he "Franco" left, he reappeared on the scene, opening the door bearing coffee for plaintiff. This time Scolovino forced "Franco" out the door, and said "out Franco". After impeding "Franco's" reentry into the cabin, Scolovino went out to report him. On the way up "Franco" again reappeared and asked Scolovino what she was going to do. Scolovino testified that she reported "Franco" to the Chief Cabin Steward, alleged to be "Franco's" boss, who indicated that he would take care of the matter.

Scolovino testified that, after reporting the incident, she returned to the cabin where she again saw "Franco" outside the door. Inside the cabin were plaintiff and her husband Spinola. Upon seeing the husband in the cabin, Scolovino felt relieved and departed to have breakfast. At this point, according to plaintiff's testimony, her husband and "Franco" engaged in a colloquy in the English language in more or less the following terms:

Husband: "Why did you do this?"

"Franco": "I thought it was joke."

Husband: "This is my wife."

"Franco": "I don't need more trouble, I want you to call my boss and tell him it was a mistake."

Plaintiff testified that she and her husband, Spinola, forgave "Franco" for his act and "Franco" dialed a telephone number. Plaintiff informed whoever answered at the other end that everything was alright. While this was happening, the husband, Spinola, sat quietly.

That morning both plaintiff and Scolovino disembarked and shared a hotel room in San Juan. Thereafter, plaintiff worked on and off as a cocktail waitress. Scolovino returned to work for defendant aboard a different vessel.

## II. DEFENDANT'S CASE:

In contraposition to this factual scenario, defendant presented three witnesses. The first was a cabin steward by the name of Franco Mennella. Defendant maintains that on November 18 and 19, 1983, there was only one cabin steward with the name of Franco. A review of the crew list (Joint Exhibit 3) supports this position. Neither plaintiff nor Scolovino implicated Mennella as the "Franco" of the incident in question, and Mennella denied having knowledge of the occurrence.

Defendant's second witness was the Chief Cabin Steward aboard the vessel on November 18 and 19, 1983. Scolovino could not identify him as the man to whom she reported the incident. The Chief Cabin Steward testified that on the night in question he did not receive any complaints about any cabin steward, nor any complaints with respect to any sexual molestation.

The third defense witness, the Chief Purser of the vessel, testified that, with respect to the night in question, he never received any complaint or information about any type of sexual assault or molestation. He further testified that he knew of plaintiff and Scolovino boarding at St. Thomas and had his reservations about this but did not formally object because they had paid a full fare. He further remembered receiving a passenger complaint about a "loud party" in cabin 736, the cabin shared by plaintiff and Scolovino. He also recalled that he had seen plaintiff and Sco-

lovino drinking at different bars aboard ship on the night in question.

### III. CONCLUSIONS OF FACT:

■ Having heard the contending versions at trial, and having had the opportunity to closely examine the demeanor of the witnesses, especially with respect to the manner in which the central incident was related, the Court finds, as a matter of fact, that the sexual molestation alleged by plaintiff did not take place. The inconsistencies are too many and the gaps in the evidence too wide for this Court to find otherwise.

First, the Court cannot accept at face value the account advanced by plaintiff and the witness Scolovino. It is not credible that plaintiff could for so long a period of time remain under the mistaken impression that she was engaged in sexual activity with her husband, assuming, *arguendo*, it had been someone else and the incident had occurred.

Secondly, the Court finds Scolovino's testimony extremely suspect. On direct examination, this witness was precise and sure of numerous details during her narrative of what had happened on the night in question. During cross-examination, however, it was revealed that she had omitted from her detailed narrative the fact that, on the very night in question, she had fractured an arm at sometime between 12:00 and 2:00 a.m. and had received medical treatment for it. A fractured arm occurring on the same night was not a trivial matter to have been lightly cast aside by Scolovino. Such an omission puts into question the accuracy of Scolovino's narrative of the events on the night in question.

The evidence contains further inconsistencies. Neither plaintiff nor Scolovino knew who the Chief Cabin Steward was, although both had previously worked on the ship, and Scolovino claimed to have reported the incident directly to him. Indeed, the evidence regarding the reporting of the incident is unpersuasive. From the Chief Purser's testimony, it appears that a claim of sexual molestation of a passenger would have received more than just passing attention. Yet, despite the seriousness of the matter, there is no recollection or record of it. Pertaining to the broken arm accident, Scolovino reported the accident through regular ship's channels. A physician report, Staff Captain report and second officer report were prepared. The incident was logged in the ship's log book. The sexual molestation which Scolovino testified that she reported some hours later, did not follow this pattern. Moreover, after plaintiff disembarked, she undertook no further formal or informal attempts to report the matter to any competent authority even though the ship was within the territorial waters of Puerto Rico. There was nothing in the evidence to suggest that she was impeded from doing so by any threats or coercion.

Plaintiff's failure to identify "Franco" seriously detracts from the credibility of the testimony presented by plaintiff and Scolovino. Plaintiff claims that "Franco" was a cabin steward. The crew list, however, revealed only one steward named "Franco", and he, by all indications of the plaintiff, was not involved. Thus, the Court is left to speculate as to the actual existence of "Franco". Moreover, assuming he had existed, it is difficult to believe that he then returned to the scene again, and again. Once having returned, it is difficult to accept that plaintiff and her husband Spinola would so casually excuse the man whose act represent the cause of action pleaded here. The Court finds it more credible to accept that the act complained of did not happen.

Viewing all the above in light of the evidence as a whole, and taking into consideration the various inconsistencies, the sexual molestation charge must be dismissed as not being substantiated by a preponderance of credible evidence.

■ The Court is further unpersuaded as to plaintiff's evidence presented on the issue of negligence. To prove the ship was negligent, plaintiff's witness, Scolovino, testified that the pictures taken of the door

of the cabin (Joint Exhibit 4) had a chain which it did not have in November 1983. Even assuming that this constitutes evidence of negligence, cf. Fed.R.Evid. 407, plaintiff presented no further evidence to establish the condition of the door and the lock without the chain at the time of the alleged incident. The remedial measure alone would not establish that the door and the lock were defective in November 1983 and that defendant was negligent, even assuming that an intruder entered the cabin on the night in question, a fact which plaintiff has failed to prove.

The Court is mindful of the duties owed by vessels to persons coming aboard as guests or passengers. *E.g. Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959) (licensee owed duty of reasonable care); *Rainey v. Paquet Cruises, Inc.,* 709 F.2d 169 (2nd Cir.1983) (discussing whether passenger is owed "a very high degree of care" or "reasonable care under the circumstances"); *Complaint of Compagnie Generale Transatlantique,* 392 F.Supp. 973, 976 (D.P.R.1975) ("A carrier is bound to exercise the highest degree of care and diligence ..."). However, after careful analysis of the evidence, and with due regard to the demeanor of the witnesses, the Court cannot find that the vessel in any way breached its duty toward plaintiff. As the party with the burden of proof in this action, plaintiff has failed to establish that the molestation in fact occurred, that a crewmember was involved, or that the locks, door or other equipment of the vessel were defective. Given this failure, the court must enter a finding in favor of the defendant.

## IV. CONCLUSION:

■ Our primary duty and discretion as a trier of fact is to assess credibility. *See* F.R.C.P. 52(a); *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) (when testimony of witness is not believed, trier of fact may simply disregard it). In this case, the Court has had the opportunity to observe and question all the witnesses and, in particular, plaintiff and her witness. We have considered each witness' intelligence, maturity, state of mind and demeanor while on the stand. Due consideration was given to the witnesses' ability to observe the matters under testimony, the manner in which a judgment may be affected by said testimony, and the extent to which each witness' testimony was either supported or contradicted by other evidence.

From all the foregoing, the Court concludes that plaintiff's story bears no credibility. *Santana v. U.S.,* 572 F.2d 331 (1st Cir.1977) (trial court not compelled to accept plaintiff's testimony even if uncontroverted); *Wilbur-Ellis Co. v. M/V Captayannis "S",* 451 F.2d 973 (9th Cir.1971) (court not bound to accept improbable, unreasonable or otherwise questionable testimony); *see also In re Aircrash Disaster at Boston, Mass., July 31, 1973,* 412 F.Supp. 959, *aff'd.; Delta Airlines, Inc. v. U.S.,* 561 F.2d 381 (1st Cir.1976) (testimony of weather change not credible where witness aware of regulation requiring him to report weather change and report not done).

The plaintiff had the burden of proof by preponderance of the evidence; since we do not accept the testimony of plaintiff and her witness, we find that plaintiff has failed to carry that burden. No credible evidence indicates that the sexual molestation more likely than not occurred. When the credible evidence offered by the parties is compared, the preponderance of evidence shows that defendant's position that no such act occurred is the more reasonable and convincing. *E.A.C. Timberlane v. Pisces Ltd.,* 580 F.Supp. 99, 121–22 (D.P.R. 1983), *aff'd.* 745 F.2d 715 (1st Cir.1984). We find in favor of the defendant, and assess costs against the plaintiff.

The Clerk of Court is to enter judgment accordingly with costs to the defendant.

IT IS SO ORDERED.