**In re AIR CRASH DISASTER AT NEW ORLEANS (MOISANT FIELD), LOUISIANA ON MARCH 20, 1969.**

**Mary I. CATES et al.,
Plaintiffs-Appellants,**

**v.**

**UNITED STATES of America,
Defendant-Appellee.**

**No. 75–2066.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 5, 1976.

Decided Oct. 14, 1976.

James D. Causey, Memphis, Tenn., Lee S. Kreindler, New York City, Robert L. Dobbs, George T. Lewis, Jr., Memphis, Tenn., for plaintiffs-appellants.

Thomas F. Turley, Jr., U. S. Atty., W. Hickman Ewing, Jr., Memphis, Tenn., Elliot Marks, Federal Aviation Administration, Washington, D.C., for defendant-appellee.

Before EDWARDS, McCREE and MILLER,* Circuit Judges.

EDWARDS, Circuit Judge.

This is a suit against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1970), brought by representatives of the estates of nine men who were killed in the crash of an unscheduled airplane at the New Orleans International Airport (Moisant Field) in New Orleans, Louisiana, on March 20, 1969. Appellants alleged proximate negligence on the part of the Federal Aviation Administration (hereinafter FAA) air controllers at Moisant Field who had been in contact with the

* Hon. William E. Miller died on April 12, 1976, and did not participate in this opinion.

DC–3 before the crash. The aircraft had been leased by Avion, Inc., to one William Jackson, doing business as Travel Associates, for a charter flight of hunters from Memphis, Tennessee, to Belize, British Honduras. The aircraft was scheduled to clear customs at Moisant Field at New Orleans on March 20, 1969. It departed from Memphis around 4:30 a. m. and, seeking to make a bad visibility landing, it crashed after bouncing off a runway at Moisant at approximately 6:55 a. m. All three crew members and 13 of the 24 passengers were killed.

The pilot of the DC–3 had been warned several times by FAA controllers during the flight from Memphis to New Orleans that Moisant Field was affected by smoke and ground fog, that visibility was less than 600 feet (well below its minimum requirement for landing of 2,400 feet). He was told that no planes had landed at Moisant but that the weather was expected to clear around 9 a. m. The pilot decided to fly to Moisant and asked and received permission to come in for a low level approach and "look at it."

Apparently relying upon the clearance to make the low level approach and upon an incomplete (or erroneous) answer to a question about which the primary issue in this case revolves, but without ever asking for or receiving "clearance to land," the pilot made the approach and descended to where on his last transmission he told the tower he had "the strobe lights in sight." The physical facts of the accident showed that he then descended below the 202 MSL (feet above mean sea level) "missed approach" level, struck runway 10 at Moisant at a 25° angle, bounced off, and failing to gain altitude, struck the ground heavily at a distance of 3000 ft., the plane finally coming to rest in flames 5000 ft. from the first point of impact.

Evidence presented by the government included the testimony of two survivors of the crash who were themselves amateur pilots. Both testified that they had watched out the window of the DC–3 and had seen that the ship was flying through heavy fog in the minutes before the crash.

One testified to a brief glimpse of the runway before the fog closed in again just before the crash.

FAA Regulations clearly forbid a pilot to land without the minimum required visibility "unless otherwise authorized by the Administrator."

(b) *Landing minimums.* Unless otherwise authorized by the Administrator, no person operating an aircraft (except a military aircraft of the United States) may land that aircraft using a standard instrument approach procedure prescribed in Part 97 of this chapter unless the visibility is at or above the landing minimum prescribed in that part for the procedure used. If the landing minimum in a standard instrument approach procedure prescribed in Part 97 of this chapter is stated in terms of ceiling and visibility, the visibility minimum applies. However, the ceiling minimum shall be added to the field elevation and that value observed as the MDA or DH, as appropriate to the procedure being executed.

14 C.F.R. § 91.116(b).

During the radio transmission between Moisant approach controller Goertz and the pilot, Goertz was asked about minimums and confirmed that 2400 ft. visibility was required to land at Moisant. Goertz inquired as to whether or not the pilot had a current approach plate for Moisant Field and received an affirmative answer. The approach plate established the point of decision as 202 feet above mean sea level and specified the method for handling a missed approach. Thus from the beginning Goertz knew that the pilot knew that he needed 2400 feet visibility and, if he did not have it, he was required to abort the landing attempt without going below 202 feet and execute a missed approach.

In the case of an ILS Approach, the pilot is specifically forbidden to descend below decision height unless his aircraft is lined up with the runway for "a normal approach."

(b) *Descent below MDA or DH.* No person may operate an aircraft below the prescribed minimum descent altitude or

continue an approach below the decision height unless—

(1) The aircraft is in a position from which a normal approach to the runway of intended landing can be made; and

(2) The approach threshold of that runway, or approach lights or other markings identifiable with the approach end of that runway, are clearly visible to the pilot.

If, upon arrival at the missed approach point or decision height, or at any time thereafter, any of the above requirements are not met, the pilot shall immediately execute the appropriate missed approach procedure.

14 C.F.R. § 91.117(b).

Without regard to whether anybody was negligent in getting the DC–3 to a point 202 feet in the air above Moisant Airport, it may well be that the critical fact of this accident was the pilot's error in determining to try to land when his heavily loaded plane was not lined up with the runway. Since the marks from the DC–3's first bounce on the runway and those made by the subsequent crash contact indicated the plane was at a 25 degree angle with the runway, it is obvious the pilot should never have descended below 202 feet (MSL).

■ On this issue the District Judge found:

From the angle of the skid marks on the runway and the testimony of the passengers, this Court finds that the requirements of 14 C.F.R. § 91.117(b) were not maintained. To descend below DH when the requirements were not met or maintained constituted a violation of that section and constituted another one of the forms of negligence on the part of the crew which was the proximate cause of the crash.

We cannot hold this finding to be clearly erroneous.

■ Clear as may be the causal relationship between pilot negligence and the deaths of appellants' decedents, this still does not answer the principal question in this appeal. The negligence of the pilot is in no way attributable to his passengers and cannot exculpate the controller or relieve the government of liability if their negligence also contributed to causing the accident.

In a recent case where, due in part to an air controller's error, 16 Air National Guardsmen, parachuted through clouds to their deaths in Lake Erie, this court made clear that concurrent or subsequent negligence did not exonerate the government. *Freeman v. United States,* 509 F.2d 626 (6th Cir. 1975). Additionally, we note that the same basic rule of negligence is followed in Louisiana where this accident occurred. *Gaspard v. LeMaire,* 245 La. 239, 158 So.2d 149 (1963); *Hall v. Department of Highways,* 213 So.2d 169 (La.App.1968). Thus appellants' arguments remain to be dealt with.

Before proceeding to the critical question in this case, we will deal with two of appellants' arguments which appear to us to require appellate rejection.

■ First, appellants contend that since the air controllers knew that the New Orleans Lake Front Airport, 12 miles from Moisant, was open and the DC–3 could land there, there was a duty on the part of the controllers, even though no request for an alternate had been made, to inform the DC–3 pilot of this fact. Air traffic control in Houston and in New Orleans had continually reported visibility conditions below minimal landing levels at Moisant all during the time the DC–3 was flying toward New Orleans. On the pilot's inquiry Houston had supplied alternate landing sites which it knew to be open. The DC–3 never sought any alternate from Moisant but asked the approach controller for permission to come in for a low level approach to see whether or not it could land. There was an expectation of clearing at Moisant sometime around 9 a. m. and there is a definite indication on a transmission from the pilot to the Houston controller that the DC–3 planned to hold until then if it could not land immediately. We noted above that the DC–3 planned to clear customs at Moisant Field for its flight to Honduras.

There is no indication in this record that it could have cleared customs at Lake Front Airport. Under these circumstances we can find no legal duty on the part of the controller to inform the DC–3 about Lake Front until some inquiry was made or some emergency appeared.

■ Second, appellants also claim that the District Judge erred in not finding proximate negligence in the failure of the approach controller to use a red light to alert the local or tower controller to the fact that the DC–3 was making a low level approach. The approach controller did, however, tell the DC–3 pilot to switch to the local controller on a frequency which he supplied. The DC–3 pilot did so and the local controller responded. While the District Judge's finding of negligence in failure to employ the red light cannot be faulted, neither can we reverse his finding that the failure to activate the red light had no causal relation to the accident. There was no other traffic at Moisant at the time and the local controller was informed that the DC–3 was going to make a low level approach. As far as we can see, the red light would have added nothing to the situation which could have helped avoid the accident.

The most serious issue in this appeal, however, concerns a conversation between the DC–3 pilot and the approach controller which occurred at 1238:15 (6:38 a. m.) when the DC–3 was approximately 25 miles from Moisant. We shall quote all exchanges by radio between the DC–3 (142 Delta) and the approach and local controllers at Moisant. The dialogue begins with the handoff from Houston Control to Moisant Control of the DC–3:

### Between Houston Control (ZHU ARTCC) and New Orleans Approach Control (MSY A/C)

ZHU ARTCC Approach inbound from the north. (1234:25)

MSY A/C Approach.

ZHU ARTCC I've got a D C three here says he wants to come in and take a look at it—november one four two delta. D C three slant delta he's over Madison descending to three thousand primary target your control.

MSY A/C Is that five northwest of Oyster?

ZHU ARTCC That's correct.

MSY A/C Radar contact. (Unintelligible)

ZHU ARTCC H. D. (1235:00)

### Between Houston Control (ZHU ARTCC) and the plane (N142D)

ZHU ARTCC Douglas one four two delta, say your altitude. (1235:15)

N142D Three point five.

ZHU ARTCC Douglas one four two delta, contact New Orleans Control one two five point five now.

N142D One twenty-five five roger. (1235:30)

### Between the plane (142D) and New Orleans Approach Control (MSY AR/DR)

1235:33 142D Ah, New Orleans Approach, Douglas one forty-two Delta out of three point four for three thousand.

MSY AR/DR Douglas one four two Delta, New Orleans Approach Control, maintain three thousand, proceed direct to the ILS outer compass locator and, ah, weather is, ah, sky partially obscured, visibility one-sixteenth, fog and smoke, altimeter three zero zero zero, runway one zero visual range less than six hundred feet

1236:18 MSY AR/DR Did you get that, one four two Delta?

142D Ah, Roger, four two Delta, we got it, ah

1236:36 142D Ah, Approach, one four two Delta, what'd you say you had on the RVR?

MSY AR/DR Less than six hundred feet

142D Ah, roger, what's your minimums? Twenty-four hundred?

MSY AR/DR That's correct. Category two is not authorized, ah, center line lights are inoperative, ah, not adequate.

1236:54 142D Ah, roger, ah ((in background from flight)) ask him if we can make a *low* pass

1237:32 142D Ah, Approach, ah, one forty-two Delta, we can see the ground out here, ah, do you think that's going to imporve [sic] any shortly?

MSY AR/DR Since about, ah, two o'clock this morning it's been getting progressively worse and, ah, aircraft have been able to see the ground all night. However, the horizontal visibility is, ah, as depicted, one-sixteenth prevailing visibility and, ah, less than six hundred RVR

142D Ah, roger, ah, will we be legal to make a pass and look at it?

MSY AR/DR I can clear you for an approach, ah, yes, ah, you can make the low approach if *you'd* like

1238:15 142D Ah, roger, well, if, ah, we can get contact with the ground will we be legal to land if that's six hundred feet?

MSY AR/DR Four two Delta, according to the approach plates if you get the runway or approach lights in sight, ah, correction on that, it says, ah, descent is not authorized, well actually what it should say is that, ah, the approach plate is, ah, self-explanatory. If you can see the runway or approach lights, affirmative, you can land

1239:05 142D Ah, roger

1243:31 142D Approach Control, Douglas one four two Delta, would give us a vector for an ILS?

MSY AR/DR Douglas four two Delta, affirmative. What's your heading right now?

142D Heading, ah, one nine five

MSY AR/DR Douglas four two Delta, turn right heading two two zero, descend and maintain two thousand.

142D You had any aircraft land?

1243:51 MSY AR/DR No sir

1244:00 142D Are your high intensity strobe lights working?

MSY AR/DR Affirmative

1246:47 142D Approach Control, one forty-two Delta, you want us to remain three thousand?

MSY AR/DR Four two Delta, negative, descend and maintain two thousand

142D Ah, roger, out of three for two

1248:05 142D Four two Delta level two thousand

MSY AR/DS Four two Delta say again

142D Ah, level at two thousand

MSY AR/DR Okay, turn left heading one seven zero

142D Left to one seven zero, roger

1248:55 MSY AR/DR Four two Delta, do you have your current, ah, approach plate with you? ILS, ah, runway one zero? Thirteen February sixty-nine?

142D Ah, say again

MSY AR/DR Do you have your approach plate with you?

142D Affirmative

MSY AR/DR Okay, turn left heading one three zero. What are your intentions?

142D Ah, we'll make a low pass and see if we can pick up the lights

MSY AR/DR Roger, turn left heading one three zero, proceed inbound on the localizer, cleared for ILS approach

1249:24 142D Roger

1249:58 MSY AR/DR Douglas four two Delta, three west of outer marker, contact Moisant Tower one one niner point niner

142D Roger

Between the plane (142D) and New
Orleans Local Control (LC/GC)

1250:12 142D Ah, Moisant Tower, Douglas one four eight—one forty-two Delta

LC/GC Douglas on ground, say again

142D One four two Delta

LC/GC Okay, Douglas four two Delta, Moisant Tower, go ahead

142D Ah, roger, we're approaching the outer marker. We're going to make a low pass, see if we can pick up the lights.

1250:44 LC/GC Roger

1253:56 142D Four two Delta got the strobe lights in sight

LC/GC Roger

Appellant claims that the transmission which we have quoted above helped induce the pilot errors and the crash. Appellants rely particularly upon this:

142D "Ah, Roger, ah, will we be legal to make a pass and look at it?"

MSY AR/DR "I can clear you for an approach, ah, yes, ah, you can make the low approach if you'd like."

1238:15 142D "Ah, roger, well, if, ah, we can get contact with the ground will we be legal to land if that's six hundred feet?"

MSY AR/DR "Four two Delta, according to the approach plates if you get the runway or approach lights in sight, ah, correction on that, it says, ah, descent is not authorized, well actually what it should say is that, ah, the approach plate is, ah, self explanatory. If you can see the runway or approach lights, affirmative, you can land."

The critical transmission occurred at 1238 (6:38 a.m.) when the DC–3 was approximately 25 miles from Moisant.

Appellants contend:

Goertz . . . should have realized that the crew would follow his advice, make an approach to the airport, descend to and continue below decision height and attempt to land. That was the plain meaning of this transmission at 1238:15. Having thus placed the aircraft in a position of peril, the Government is liable under Louisiana law for all consequences that followed, including the possibility that a faulty approach or missed approach might be made under the marginal weather existing at the time.

Appellants contend further that this answer could have created an impression in the mind of a not very experienced or well-trained pilot that if on his low level approach at the point of decision he was able to see the approach lights, it was legal for him to undertake a landing without anything more.

This argument appears to us to seek to shift primary responsibility for operation of an airplane from the pilot who is flying it to the controller on the ground. The total thrust of the applicable FAA Regulations, however, is to the contrary. FAA Regulations clearly make the pilot the final authority on operation of his plane.

§ 91.3 *Responsibility and authority of the pilot in command.*

(a) The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.

14 C.F.R. § 91.3.

§ 91.9 *Careless or reckless operation.*

No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property or another.

14 C.F.R. § 91.9

■ The Air Controller's function is to aid the pilot and to regulate air traffic—particularly at or near airports. But the pilot always remains the "final authority as to the operation of [his] aircraft." *Bibler v. Young,* 492 F.2d 1351, 1358 (6th Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974). Nonetheless, the law requires both pilots and controllers to employ reasonable or due care. *Freeman v. United States,* 509 F.2d 626 (6th Cir. 1975); *Spaulding v. United States,* 455 F.2d 222 (9th Cir. 1972). *See also United States v. Miller,* 303 F.2d 703 (9th Cir. 1962), *cert. denied,* 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963).

The government argues that the clearance to land is only given when it is asked for, that the DC–3 never sought a clearance to land, that a clearance to make a low level approach was given 10 minutes after the question and answer quoted above, that this approach clearance contradicted any possible inference of a previous clearance to land, that a clearance to land is ordinarily given after the plane has been transferred from contact with the approach controller to contact with the local or tower controller, and that the DC–3 never asked for or received any clearance from anybody to do more than to "make a low pass and see if we can pick up the lights."

As to this conflict the District Judge found on clearance:

Clearances to land are not normally issued by an approach controller, where there is an operating control tower with a local controller present. Further, a clearance to land is not granted prior to a clearance to approach being obtained from local control and especially not at a point 25 miles from the airport. Some ten minutes after the discussion regarding legality, the controller asked the aircraft its intentions and in the standard terminology cleared him for an approach by saying, "cleared for ILS approach."

It was extremely unreasonable for the pilot to assume that he had a landing clearance at that point, even if he had thought one had been implied earlier.

He also found negligence on the part of the controller, but no proximate cause:

Plaintiffs contend that, assuming no clearance was given, the failure of Goertz to provide a complete and accurate answer to the legality question was negligence which caused the accident. There is no duty on an air traffic controller to be able to quote verbatim regulations primarily designed for the pilot, but if he undertakes to do so it is negligent to do so in a fashion that is erroneous or incomplete. The last portion of his transmission, "if you can see the runway or approach lights, affirmative you can land," came from his memory of what the regulations stated concerning requirements for making a landing and it was erroneous and incomplete. Therefore, the Court concludes that to this extent the approach controller was negligent, but that this negligence was not the proximate cause of the crash.

Further, the District Judge found that negligence of the pilots of the DC–3 in violating FAA Regulations was "the sole proximate cause" of the fatal crash:

The sole proximate cause of the accident was the extremely poor judgment and negligence of the pilots in violation of the regulations and proper operating practices. This was shown at the outset of the trip and continued until the crash.

\*     \*     \*     \*     \*     \*

This Court finds in the instant case that the acts and words of the controllers in no way reasonably and probably caused the pilot to take the negligent actions which he did in attempting to land N142D.

The patent recklessness of the pilot and crew of N142D superseded the negligence of the United States, which was not proximate.

■ This case was tried under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1970). This statute waives governmental immunity concerning tort claims and provides for government liability "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." The statute calls for trial of tort claims before a federal District Judge. On this appeal we are required to review his findings of fact against the "clearly erroneous" standard and his conclusions of law against the applicable statutes and regulations.

FAA Regulations require a pilot to secure a clearance to land.

(h) *Clearances required.* No pilot may, at an airport with an operating control tower, taxi an aircraft on a runway, or takeoff or land an aircraft, unless he has received an appropriate clearance from ATC. A clearance to "taxi to" the runway is a clearance to cross all intersecting runways but is not a clearance to "taxi on" the assigned runway.
14 C.F.R. § 91.87(h).

INSTRUMENT FLIGHT RULES

§ 91.115 *ATC clearance and flight plan required.*

No person may operate an aircraft in controlled airspace under IFR unless—

(a) He has filed an IFR flight plan; and

(b) He has received an appropriate ATC clearance.

14 C.F.R. § 91.115.

These same principles are spelled out even more clearly in the Airman's Information Manual:

### CLEARANCE

GENERAL.—A clearance issued by ATC is predicated on known traffic. and known physical airport conditions. An ATC clearance means—an authorization by ATC, for the purpose of preventing collision between known aircraft, for an aircraft to proceed under specified conditions within controlled airspace. IT IS NOT AUTHORIZATION FOR A PILOT TO DEVIATE FROM ANY RULE OR REGULATION NOR TO CONDUCT UNSAFE OPERATION OF HIS AIRCRAFT. FAR 91.3(a) states: "The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." If ATC issues a clearance that would cause a pilot to deviate from a rule or regulation, or in the pilot's opinion, would place the aircraft in jeopardy, IT IS THE PILOT'S RESPONSIBILITY TO REQUEST AN AMENDED CLEARANCE. Similarly, if a pilot prefers to follow a different course of action, e. g., land on a different runway, takeoff from a different intersection, takeoff from the threshold instead of an intersection, etc., HE IS EXPECTED TO INFORM ATC ACCORDINGLY. When he requests a different course of action, however, the pilot is expected to cooperate so as to preclude disruption of traffic flow or creation of conflicting patterns.

\* \* \* \* \* \*

6. A clearance, information, or request for information originated by an ATC facility and relayed to the pilot through an air/ground communication station will be prefixed by "ATC CLEARS," "ATC ADVISES," or "ATC REQUESTS."

Airman's Information Manual, Department of Transportation (Part I, Nov., 1971) 1–44, 1–45.

■ Our review of the facts applicable to the clearance issue convinces us that the District Judge's findings were not clearly erroneous and that he did not misapply the applicable FAA Regulations or the law of Louisiana.

While Controller Goertz's answer given at 1238:15 was certainly incomplete and negligent, as the District Judge found, in our view it was not a "clearance to land" and it could not have given a reasonable man in the position of the pilot of the DC–3 either legal sanction for or encouragement of an attempt to make a landing under the circumstances which he actually faced over Moisant Field.

The critical facts about the conversation are that 1) it took place 25 miles and 12 minutes away from Moisant Field, and 2) that 10 minutes subsequent thereto the pilot of the DC–3 asked for and received a clearance for a low level approach. Both of these facts are inconsistent with any reasonable interpretation of Goertz's answer as a clearance to land.

■ We believe that the record shows that clearance for a low level approach to "look at it" or to "pick up the lights" was consistent with FAA Regulations and the circumstances. In shifting fog conditions the DC–3 could have come down to decision height, found itself lined up for the runway with 2400 feet of visibility ahead, and thereupon asked for and received the tower's clearance to land—even though the tower was still shrouded in fog.

While this record engenders much sympathy for the totally innocent victims of this tragedy, neither the law of Louisiana nor that of the United States sanctions a governmental insurance approach to the problems of their survivors.

The judgment of the District Court is affirmed.