**TEXASGULF INC. and Texasgulf Aviation, Inc., Plaintiffs,**

v.

**COLT ELECTRONICS CO., INC., Phoenix Aerospace, Inc., the Garrett Corporation, Lockheed Corporation, and the United States of America, Defendants.**

**And Related Actions.**

Nos. 81 Civ. 7147, 82 Civ. 0816, 82 Civ. 3045, 82 Civ. 3640, 82 Civ. 3912, 82 Civ. 3913, 82 Civ. 4997, 82 Civ. 5278, 82 Civ. 6296, 82 Civ. 6297, 82 Civ. 6459, 83 Civ. 1082, 83 Civ. 1083, 83 Civ. 3662, 83 Civ. 3663 and 83 Civ. 5323 (GLG).

United States District Court, S.D. New York.

Nov. 16, 1984.

---

Whitman & Ransom, New York City (Kevin Keating and Richard F. Lawler, New York City, of counsel), for plaintiffs Mary V. Drew and Mary L. McKee.

Kreindler & Kreindler, New York City (Milton G. Sincoff and Steven Earl Anderson, New York City, of counsel), for plaintiffs Morgan Guaranty (Fogarty), Woodling and Claydon.

Speiser & Krause, P.C., New York City (Frank H. Granito, Jr., New York City, of counsel), for plaintiff Constance A. Boyle.

Costello & Shea, New York City (J. Donald Tierney, New York City, of counsel) and Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash. (Keith Gerrard, Richard C. Coyle and Sherilyn Peterson, Seattle, Wash., of counsel), for defendant and third-party plaintiff Garrett Corp.

Lester Schwab Katz & Dwyer, New York City (B. Jennifer Jaffee, New York City, of counsel) and Blackwell Sanders Matheny Weary & Lombardi, Kansas City, Mo. (Tim-

othy W. Triplett, Kansas City, Mo., of counsel), for defendant and third-party plaintiff Colt Electronics Co., Inc.

Donovan Leisure Newton & Irvine, New York City (James L. Stengel, New York City, of counsel) and Morris, Larson, King, Stamper & Bold, Kansas City, Mo. (Steven G. Emerson, Kansas City, Mo., of counsel), for defendant and third-party plaintiff Phoenix Aerospace, Inc.

Mendes & Mount, New York City (Kevin F. Cook, James W. Hunt and James M. Fitzsimons, New York City, of counsel), for defendant and third-party plaintiff Lockheed Corp.

J. Paul McGrath, Asst. Atty. Gen., John S. Martin, Jr., U.S. Atty., Dept. of Justice, Torts Branch, Civil Div. by Kathlynn G. Fadely and Susan M.H. Gillett, Trial Attys., Washington, D.C., for defendant U.S.

Townley & Updike, New York City (Frederick D. Berkon, John C. Sabetta, Michael Belohlave and James Altieri, New York City, of counsel), for defendants and third-party defendants TexasGulf Inc. and TexasGulf Aviation Inc.

### FINDINGS OF FACT and
### CONCLUSIONS OF LAW

GOETTEL, District Judge:

This Court must determine the liability, if any, of the United States of America for an airplane crash. The following are the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a):

### FINDINGS OF FACT

On February 11, 1981, a Lockheed JetStar, owned and operated by Texasgulf Avi-

---

ation, Inc., crashed at approximately 6:40 p.m. EST during an instrument landing system approach, a mile short of Runway 16 at the Westchester County Airport, White Plains, New York. All six passengers on board and the two man crew perished in the crash.

Actions were filed against several parties: the owner/operator of the aircraft, Texasgulf Inc. and Texasgulf Aviation, Inc.; four product defendants, Colt Electronics Co., Inc., Phoenix Aerospace, Inc., the Garrett Corporation, and the Lockheed Aircraft Corporation; and the United States of America. The plaintiffs are representatives of the six passengers on board the aircraft,[1] and Texasgulf Inc. and Texasgulf Aviation, Inc. (the "Texasgulf Companies") for the loss of "the hull" (*i.e.*, the aircraft). The United States is a direct defendant in Federal Tort Claims actions brought by these plaintiffs, and a third-party plaintiff, third-party defendant, and fourth-party defendant in other actions based on claims for contribution and indemnity. Allegations against the United States pertain to negligence on the part of air traffic controllers at the Westchester Air Traffic Control Tower.[2]

The consolidated actions were tried before a jury over a period of two months and two weeks,[3] with the Court reserving the claims against the United States for its decision. The jury returned a verdict for the plaintiffs, finding the Texasgulf Companies 70% responsible, Garrett 20% responsible, and Colt and Phoenix each 5% responsible.

The plaintiffs claimed, *inter alia*, that the aircraft crashed due to a loss of

---

**1.** The estates of the two crew members commenced actions that were subsequently settled.

**2.** Originally, all the plaintiffs filed suit against the United States alleging negligence on the part of the air traffic controllers and negligent certification by the Federal Aviation Administration ("FAA") in issuance of a Supplemental Type Certificate allowing installation of Phoenix Aerospace generator control units on the Lockheed JetStar. The plaintiffs voluntarily dismissed the negligent certification allegations against the United States shortly before trial.

**3.** An earlier one-month trial was held before a different jury in the spring on the Texasgulf Companies' affirmative defenses of Workers' Compensation and release. That jury decided in favor of the estate plaintiffs. *See Gregory v. Garrett Corp.*, 578 F.Supp. 871 & 890 (S.D.N.Y. 1983) (denying motions for summary judgment on the affirmative defenses because of the existence of issues of fact).

electrical power approximately three miles[4] from the end of Runway 16 and while the aircraft was in instrument meteorological conditions. Claims against the product defendants rested, *inter alia*, on allegations that generator control units installed on the aircraft some two weeks before the accident were incompatible with the Lockheed JetStar electrical system, that the installation was negligently performed, and that the generator control units caused generators on board the aircraft to trip off the line resulting in a loss of electrical power when the back up batteries, which were worn down by earlier usage, also failed. Various claims were made by some of the plaintiffs, and all of the defendants, against the Texasgulf Companies charging negligence in the maintenance and operation of the plane. The theory against the United States was that the air traffic controllers at the Westchester County tower saw on their radar scopes the aircraft begin to deviate to the right of the localizer course, and negligently failed to warn the aircraft of its position in relation to the localizer course. The product defendants and the United States claimed that the cause of the accident was not an electrical failure, but was negligence on the part of the crew in continuing the approach into wind shear and severe turbulence which caused the aircraft to crash about one mile from the runway threshold and one-third of a mile right of course.[5]

*The Aircraft*

The accident aircraft was a Lockheed 1329–731 JetStar, serial number 5084, civil aircraft registration number N520S. From 1974 until the time of the accident, Texasgulf Aviation, Inc. ("TGA"), a wholly owned subsidiary of Texasgulf Inc., was the registered owner of the aircraft.[6] The aircraft originally was manufactured and sold by the Lockheed Corporation in 1966 as a Lockheed Model 1329 JetStar. In 1976, the aircraft underwent a conversion at the Garrett Corporation AiResearch facilities in California, wherein the original engines were replaced with four Garrett TFE–731 fan jet engines. The JetStar 731 aircraft is a transport category aircraft, a model and type frequently used in corporate or business jet operations. It is certificated by the Federal Aviation Administration ("FAA") for operation by two pilots, and is equipped with dual controls so that each pilot has the ability to fly and operate the aircraft from either seat.

The aircraft, as originally equipped, was installed with carbon pile generator control units ("GCUs"). This component part provides the basic functions of regulating voltage produced by a generator and sensing voltage abnormalities. There are five generators on the aircraft that produce electrical energy—four powered by the ship's jet engines and an auxiliary fifth that provides power on the ground when the engines are not running. The electric power so generated is used to heat and light the aircraft and operate the communications, navigation, and electronic equipment. Both the accident aircraft and its sister ship, N320S, were identically equipped.[7] In June 1980, Garrett installed on N320S solid state GCUs designed by Phoenix Aerospace and sold by Colt Electronics under a Supple-

4. All mileages referred to herein are nautical miles and all directional headings are magnetic compass, not true.

5. The National Transportation Safety Board ("NTSB") hearings concluded that all of the above-mentioned causes could have contributed to the accident, but did not reach any firm decision on the subject. (The NTSB factual findings are admissible in evidence, but its conclusions, and findings indicating its conclusions, are not.) *See American Airlines, Inc. v. United States,* 418 F.2d 180, 196 (5th Cir.1969); *Lobel v. American Airlines, Inc.,* 192 F.2d 217, 220 (2d Cir.1951), *cert. denied,* 342 U.S. 945, 72 S.Ct. 558, 96 L.Ed. 703 (1952).

6. The jury in the preliminary trial concluded that it was also the operator of the aircraft.

7. The Texasgulf Companies had a fleet of aircraft, based at different locations. The Lockheed JetStars were among those kept at Westchester County Airport, in New York State, on the Connecticut border, near the Texasgulf corporate headquarters in that state. They were used primarily for transporting corporate officers on business.

mental Type Certificate held by it. This installation was ordered by J. Morgan "Lefty" Gregory, President of TGA and pilot-in-command on the accident flight. There were a few incidents of generators tripping on N320S. Garrett repaired the system.[8]

In January 1981, Gregory sent N520S to Garrett's AiResearch facility at MacArthur Airport, Islip, Long Island, for the purpose of having extensive maintenance and inspections performed. (The Texasgulf maintenance crew was capable of doing only routine minor maintenance.) This maintenance also included replacement of the existing carbon pile GCUs with installation of the Phoenix solid state GCUs. Problems arose during the installation process. After the installation, a ground run-up of the new GCU installation was performed on January 30, 1981. The number four generator tripped off the line, the number four GCU smoked and was replaced, and other problems were encountered. After some further adjustments to the installation were made, test flights were conducted on January 31, 1981, by the Chief Pilot of TGA, Jimmy Markham. On the first two test flights, there were generator trips, including one instance when all four generators were off line. (They were reset by battery power.) Additional maintenance was performed. On the third test flight, the crew attempted to overload the electrical system of the aircraft to see if generators would trip. The generators did not trip, and Markham accepted the aircraft and flew it back to the Texasgulf hangar at Westchester County.

On February 1, 1981, Markham flew N520S to Midway Airport, Chicago, Illinois. During the flight, the number two generator tripped off the line twice and was reset without difficulty both times. On the return flight on February 3, the weather conditions required that the pilot fly under Instrument Flight Rules ("IFR").[9] Markham experienced three generators tripping on climbout; two were reset and another was left off. Later in the flight, these two generators tripped again. Markham again reset two of the generators. After this flight, Markham told his superior, Gregory, that he (Markham) would not fly the aircraft again unless the generator tripping situation was corrected.

On February 5, 1981, the aircraft flew to Wilmington, Delaware, during daylight visual conditions. On the return flight, first one and then two generators tripped off line and were reset.

When the aircraft returned from Wilmington, the Chief of Maintenance of TGA, Silvio Buccieri, telephoned Phoenix Aerospace technician Robert Shankle and Colt Electronics technician Charles Hayden.[10] He reported the continued tripping problem to them, and requested that they come to the TGA hangar at Westchester County Airport to inspect the aircraft electrical system and determine the cause of the generator trips. On February 5–6, 1981, Hayden and Shankle did an analysis of the GCU installation performed by Garrett, and found some wiring discrepancies. Garrett was informed of these problems and

---

**8.** After the accident which is the subject of this action, the solid state GCUs were replaced by the original equipment.

**9.** Aircraft operations are performed under either Visual Flight Rules ("VFR") or Instrument Flight Rules ("IFR"). In VFR flight, pilots must be able to see and avoid other aircraft and maintain visual reference with the ground. An IFR flight is necessary when the pilot may need the assistance of air traffic control to avoid other aircraft or weather conditions are such that a pilot cannot maintain visual reference to the ground or visually separate himself from other aircraft. An IFR flight also may be conducted in clear weather conditions. The testi-

mony showed that it was the policy of TGA to conduct most of its corporate flights under IFR flight plans. A flight performed in accordance with IFR is governed by the Federal Aviation Regulations found in 14 C.F.R. §§ 91.115 through 91.129.

**10.** Shankle had been involved in the development and production of the Phoenix GCU. Hayden had developed the system for using it on the Lockheed JetStar and obtained the required FAA Supplemental Type Certificate for Colt to market the system. (Colt purchased the GCUs from Phoenix and they were a part of the system installation package.)

the generator trippings. The wiring discrepancies were corrected by Buccieri and Hayden. Shankle and Hayden told Buccieri that the ground fault transformer on the number two GCU could be a cause of the tripping of the number two generator due to a higher than normal resistance.

The February 6th test flight was made with Shanley Sorenson, co-pilot on the accident flight, as pilot-in-command. Shankle was also on board. (Hayden declined to fly in the aircraft.) The number two generator tripped and was reset. After the test flight, Hayden and Shankle told Buccieri that the number two GCU should be replaced and again stated that the number two ground fault transformer had excessively high resistance, which could have been a cause of tripping, and that it should be replaced. They also told Buccieri that the number three ground fault sensor had a higher than normal resistance and should be changed.

Neither the number two nor number three ground fault transformer was changed before the last outbound flight. (To change them conveniently would have required removing an engine, which was an operation beyond routine maintenance capabilities.) No maintenance of any type was performed on the aircraft from February 6, 1981, the date of the Hayden/Shankle visit, to February 11, 1981, the date of the accident. The aircraft was not flown during this period.

*The Pilots*

Gregory was the pilot-in-command, and Sorenson the co-pilot, of the accident flight. Both Gregory and Sorenson held Airline Transport Pilot ("ATP") certificates. This rating is the highest that a pilot can obtain. In order to get an ATP certificate, a pilot must demonstrate extensive knowledge and skill in the fundamentals of air navigation, instruments, navigational aids, and weather observation and evaluation. The flight skills to be demonstrated include the ability to successfully complete instrument approaches, including missed approach procedures.

In addition to his ATP certificate, Gregory had a flight instructor rating which had expired. He also had a type rating in the Lockheed JetStar, and had accumulated approximately 24,000 total flying hours, of which some 4,500 were in the JetStar. He was considered an extremely experienced pilot, and had made thousands of landings at Westchester County Airport, many under instrument landing conditions.

In addition to his ATP certificate, Sorenson also possessed an Airplane and Powerplant Mechanic certificate. This certificate authorized Sorenson to perform aircraft maintenance. Sorenson accumulated nearly 9,000 total flying hours, of which some 1,400 were in the Lockheed JetStar.

*Westchester County Airport*

The Westchester County Airport is located at White Plains, New York, and, at the time of the accident, was the home base for the TGA operation. The runways at Westchester are Runway 16/34 and Runway 11/29. Runway 16 is so designated because runways are numbered according to their magnetic headings to the nearest ten degrees. (Runway 16 is on a heading of 162°.) Runway 16 is 6,548 feet long, 150 feet wide, and is approximately 439 feet Mean Sea Level ("MSL") at the approach end.

On the evening of the accident, Runway 16 was the instrument approach runway. It was equipped with functioning high intensity runway lights and sequenced flashing lights from the instrument landing system ("ILS"). An ILS consists of four basic ground component transmitters: localizer; glide slope; outer marker; and middler marker. The localizer transmits a signal providing azimuth or course guidance information. The glide slope function of the instrument approach provides the pilot with vertical guidance along the approach path to the runway. The glide slope transmitter at White Plains projects an electronic glide slope of 2.95° for vertical guidance during descent to the runway threshold. The outer marker is located 4.8 nautical miles from the runway threshold, and emits a vertical electronic signal that intercepts the runway

glide slope at an altitude of 2,027 feet MSL (1,588 feet above runway elevation). The middle marker is located 0.5 nautical miles from the runway threshold, and intercepts the glide slope at an altitude of 638 feet MSL (197 feet above runway elevation). Both markers have an electronic transmitter that provides the pilot with both an aural and visual signal in the cockpit that he is over the particular marker.

The ILS is designed so that the pilot sets the frequency of the localizer in his VHF receiver; the frequency of the glide slope is automatically set when the localizer is tuned in. A pilot knows that he is flying the ILS by various flight instruments. The primary source of localizer position information is a needle on the Horizontal Situation Indicator ("HSI") instrument of the pilot's Flight Director. When the needle is centered on the instrument, a pilot knows that he is flying the localizer course and the aircraft is on an electronic extension of the runway centerline. A pilot knows that he is flying the glide slope by use of the Attitude Director Indicator ("ADI") of his Flight Director system. This instrument shows the position of his aircraft in relation to the horizon as depicted by a triangular aircraft symbol. By use of the Flight Director and its computer system, the pilot will fly the instrument approach and will cross the threshold of the runway and touch down on the runway.

The accident aircraft was equipped with two Flight Directors. These Flight Directors were the primary source of pitch and roll attitude information and position of the aircraft with respect to a selected course. The command bars on the ADI provide the pilot with climb, descent, and turn commands generated by the computer after the pilot tells the computer what maneuvers he wants the aircraft to accomplish. Both the ADI and HSI provide the pilot with computer information and "raw data" information as to the position of his aircraft in relation to both the glide slope and localizer. Deviation from glide slope and localizer is depicted by the triangular aircraft symbol and also in an amount of "one dot" or "two dots." The maximum

deviation discernible from these instruments is two dots, *i.e.*, once an aircraft goes far enough off course to produce a two dot deviation on the instrument, the instrument cannot indicate whether and to what extent the plane goes still further off course. This maximum deflection of two dots is known as a "full scale deflection." At that point, the pilot is outside the envelope of useful glide slope/localizer information and cannot rely on the fully deflected indicators for accurate information as to the position of his aircraft in relation to the glide slope and/or localizer.

In addition to the Flight Director system, a pilot has an additional source of attitude information. The accident aircraft was equipped with one standby horizon system, an attitude indicator, with its own independent power source. This instrument provides information through the use of an aircraft symbol on an artificial horizon of whether the aircraft is climbing, descending, in a turn or wings level. This instrument is an electrically driven gyro powered by its own battery pack and charger. In the event of a total electrical failure of all four generators and both batteries on the JetStar, this instrument automatically should be operational and illuminated for thirty minutes of operation. If it operates properly, the "jet pack" also will power and illuminate the Captain's altimeter, transponder and radio. The reliability of the "jet pack" has been questioned.

The procedure for an ILS approach to Runway 16 provides that an aircraft proceed inbound to the airport on the localizer course of 162°, cross the outer marker at 1,588 feet above the ground level, descend on the glide slope at a constant or nearly constant rate of descent, with landing gear and flaps extended at the outer marker, until reaching the middle marker and the decision height ("DH") of 200 feet above the field elevation. Descent below DH is not authorized unless the pilot has the runway environment in sight and conditions permit the aircraft, in the judgment of the pilot-in-command, to execute a safe landing

on the runway. If not, a missed approach must be executed.

Air traffic control services are provided to planes at the Westchester County Airport by an FAA air traffic control tower. On the date of the accident, the Arrival Radar West Controller would sequence incoming aircraft and provide radar vectors to intercept the final approach course to the instrument runway at Westchester County Airport. The aircraft, by use of its flight instruments, intercepts and turns onto the final approach course for navigation to the runway. As the aircraft nears the airport, usually some five to eight miles out, the Arrival Radar Controller will transfer the aircraft to the frequency of the Tower Controller or "Local Controller."[11]

The primary duty of an air traffic controller is to provide separation of aircraft. The primary equipment used by the controllers at Westchester County Airport to provide separation is radar. The Approach Controller sits in the radar room or TRACON, and provides radar separation services to aircraft approaching or departing the Westchester County Airport. The Approach Control position in February 1981 used a model ASR–8 radar scope.[12] The radar scope in the tower cab is a BRITE scope which is an approximate 12-inch "repeater scope" or television display remoted from a radar scope in the radar room downstairs. Clarity and depiction on the approach control scope are superior to that of the BRITE scope. Due to the reduced clarity of the BRITE scope, it is not used for radar vectors or separation of air traffic, but may be used by the Local Controller as an aid in spotting aircraft visually.

Separation by use of the radar scopes is accomplished by identifying a "target" or radar return and correlating the target with an aircraft. The accident aircraft had a beacon receiver/transmitter called a transponder on board the aircraft. The transponder returns an identifying mark to air traffic control radar when radar pulses strike the aircraft.[13] The accident aircraft was equipped with an encoding altimeter, which means that the transponder return signaled the altitude of the aircraft in approximately one hundred foot increments.[14] The Westchester Tower, however, was not equipped to receive the altitude information transmitted by the aircraft. The Westchester controllers, therefore, knew only the location of the aircraft, but not its altitude. The Westchester Approach Controller, while talking to the aircraft, requested on several occasions that the aircraft provide information as to its altitude.

*Weather Conditions at the Airport*

At the time of the accident (about 6:40 p.m. EST), a cold front was approximately fifty miles west of Westchester County Airport. Regional meteorological conditions consisted of extensive low ceilings and visibilities, a moderate south-to-southwesterly flow at the surface, and a low-level jetstream above the surface flowing from 200 to 220° true. There was a well-developed low-level temperature inversion over the area at approximately 1,500 feet above ground which resulted in weather conditions that capped the moderate to severe turbulence at the lowest levels and

11. The Local Controller will clear the aircraft to land based upon relative positions of aircraft taking off and landing, and/or aircraft and vehicular traffic crossing or near the runways.

12. The range on the TRACON scope is approximately thirty miles.

13. The particular identifying mark depicted as slashes on the radar scope is peculiar to the particular transponder "code" which air traffic control assigns to the aircraft. The transponder code assigned by the New York Center to N520S on its approach to the White Plains area was 0351.

14. While the NTSB initially determined there was a 77-second gap in the transponder returns from N520S, testimony by FAA computer specialist Anthony Darienzo established that there was no such gap. Due to a computer "glitch," the initial computer run was missing this transponder information. The lost 77 seconds was found by use of a computer program developed some fifteen months after the accident. Consequently, there was no gap in the transponder returns for the aircraft.

prevented the air from moving vertically. This meant that an aircraft on approach to the Westchester County Airport would not have encountered significant turbulence until low altitudes.

Thirty minutes before the accident, a Gulfstream II (a corporate jet similar in size to the JetStar) shot an ILS approach to Runway 16 and landed safely. Prior to the approach, the weather was going above and below landing minimums. That aircraft reported severe turbulence on the approach and some wind shear, which is a change in wind speed and/or wind direction in a short distance which results in a shearing effect. The wind shear was encountered a few hundred feet above the ground.

At approximately 6:20 on the evening of the accident, an Aero Commander 690 which executed a missed approach reported to Air Traffic Control that they encountered moderate to severe turbulence during the approach, and were to the left of the localizer during the approach. Several other planes landed safely within the hour of the crash of N520S.

At the time of the accident, the surface weather observation for the airport reported visibility seven-eighths mile, runway visual range more than 6,000 feet, surface wind variable at 190° variable at 230° at 20 knots gusting to 25 knots.

*History of the Flight*

On February 11, 1981, before departure for Toronto, the crew received a weather briefing of IFR conditions forecast to exist at the estimated time of arrival back at Westchester County that evening.[15]

Captain Gregory and co-pilot Sorenson departed Westchester County Airport in N520S at 9:36 a.m. for a round trip flight to Toronto. (It is believed that Sorenson served as pilot on the outward bound trip.) The flight arrived at the Toronto International Airport around 10:30 a.m. Enroute to Toronto, the number two generator tripped and was reset. Later in the flight,

three or four generators tripped and the crew was unable to reset the generators for about eight minutes.

As a result of a call by Gregory to Buccieri pertaining to the generator trips, Buccieri contacted Hayden at Colt Electronics and Shankle at Phoenix Aerospace to seek advice as to possible corrective action that might be taken. During a conference call between Hayden, Shankle and Buccieri, the generator tripping was discussed. Shankle asked Buccieri if the number two ground fault transformer had been changed as recommended, and Buccieri said that he had changed the number two GCU but not the ground fault transformer. The subsequent discussion revolved around various possibilities for correcting the generator trip problem, including the possibility of disconnecting the ground fault transformer on the number two generator as a temporary measure.

Following the conference call, Buccieri telephoned Gregory in Toronto, who put Sorenson on the telephone. Sorenson and Buccieri discussed the possibility of disconnecting the number two ground fault transformer wire which, in effect, would disconnect the ground fault protection system for that particular generator. The number two ground fault transformer was disconnected before the return flight. Disconnecting the ground fault transformer increased the risk of an in-flight fire, but there is no evidence that such occurred. Disconnection of a ground fault transformer cannot cause or correct a multiple generator tripping problem.

Before departure from Toronto, the crew again obtained a weather briefing update and was told that the weather forecast for arrival at Westchester County was as follows: 600 feet overcast, 1 mile in light rain and fog, occasionally moderate to heavy rain; winds 180° at 15 gusting to 35; chance of indefinite ceiling 200 feet obscured, ½ mile in light rain and fog and/or

---

**15.** The forecast given for a 6:30 p.m. Westchester County arrival was as follows: 300 feet broken, 600 feet overcast; 1 to 2 miles visibility in moderate rain and fog, variable indefinite ceiling 300 feet obscured, ½ mile in heavy rain and/or thunderstorms; winds 190° at 15 miles per hour gusting to 35.

thunderstorms with light rainshowers. The pilot was advised of the possibility of turbulence and wind shear, especially at lower levels. At about 5:30 p.m., the aircraft departed Toronto.[16]

The aircraft was in contact with New York Center, and all contacts were routine. New York Center handed off the aircraft to the Westchester County Arrival Radar West Controller, Robert Abbey, at approximately 6:23 p.m. At the first radio contact, the flight was descending to 9,000 feet and had been cleared to hold northeast of the "Brews" (Brewster) Intersection, a point where the Kingston 199° radial and the Carmel 229° radial intersect. (Radials are electronic signals giving a line of position from the emitting station.) The crew was to approach the Brews Intersection by turning right on the Kingston 199° radial and entering the holding pattern. The Approach Controller instructed the crew to report when established in the holding pattern. The evidence showed that all transmissions were made by Sorenson, and Gregory was in the left seat and flying the airplane. At approximately 6:23 p.m., the crew requested the current weather and was advised as follows: "It's right on the ground, indefinite zero, sky obscured, one-eight, light rain and fog; runway 16 RVR [runway visual range] is 3,500 feet right now."[17]

At 6:26 p.m., the aircraft was cleared to descend and maintain 6,000 feet. When asked what its alternate airport would be, the crew responded LaGuardia, which also required an instrument landing at that time. (Other airports, within 100 miles of Westchester, but not as close as LaGuardia, had visual landing conditions.)

A minute later, the Approach Controller observed that the aircraft had overflown

the Kingston 199° radial and the aircraft was some five to six miles east of the radial. At 6:27 p.m., the Approach Controller instructed the aircraft to turn right heading 220°. The instructions had to be repeated when the plane did not respond. The plane then turned and Sorenson apologized for overflying the radial, which is not an unusual occurrence, but one that rarely occurred with Gregory.

At 6:28 p.m., the crew was advised by the Approval Controller that there would be a 45-minute inbound delay at LaGuardia because of traffic; the crew responded that they had enough fuel to hold at Brews for awhile.

At 6:29 p.m., the Approach Controller asked if they wanted to hold at 6,000 feet or go down to 3,000 feet to see if they got a break in the weather. Sorenson responded that they would descend to 3,000 feet.

Ten seconds later, the co-pilot reported that he showed at the Brews intersection. The Approach Controller advised the aircraft that, according to his radar scope, the aircraft was three miles east of Brews at that time and offered vectors into the holding pattern "if you have any trouble." Sorenson responded, "Oh wait just a minute here, they, ah bumped [or dropped][18] my heading, I'm sorry about that, we're just a little bit east, that's correct." The Approach Controller confirmed the aircraft was exactly three miles southeast of Brews at that time, and issued a right turn to heading 300° as a vector to establish the aircraft in the holding pattern.

At 6:30 p.m., the Approach Controller issued to the aircraft an instruction to fly a heading of 320°, which immediately was acknowledged by the crew. The crew then reported that they had just lost the right

---

**16.** After takeoff, the crew reported to Canadian air traffic control personnel a problem with the illumination on the landing gear and requested clearance to return to the airport. Shortly thereafter, the crew reported that the problem had been corrected and that the flight would proceed to Westchester.

**17.** The reported runway visual range (which is measured electronically) was above that required for an approach, but the ceiling was not.

**18.** There is a dispute as to which word was spoken and what the significance of each would be. It is not material to this decision to resolve that dispute.

side "radio" or "radial," [19] "that's what presented us a problem there." If the navigational radio was not working, the crew was required by Federal Aviation Regulation to report the loss of any instrument which would affect its ability to shoot the instrument approach or comply with an air traffic control clearance. At no time did the crew indicate that they were unable to comply with the clearances, unable to proceed to execute the ILS approach, or had a loss of navigation equipment as required by the Federal Aviation Regulations. 14 C.F.R. §§ 91.125(c) and 91.129 (1984).

At 6:31 p.m., the crew reported they would like to try to make the instrument approach. The Approach Controller then began providing vectors to the crew to intercept the ILS final approach course for Runway 16. All transmissions were promptly acknowledged and there was prompt compliance with all air traffic control clearances and instructions.

At 6:32 p.m., the aircraft was fifteen miles from Runway 16, and the crew was given a report of increased visibility and runway visual range.

At 6:35 p.m., the RVR was reported at 4,000 feet and the Approach Controller advised the aircraft it was entering a narrow band of weather approximately one mile wide, and extending north and south for about five miles. The controller advised the aircraft it would be out of the weather approximately four miles from the outer marker.

Thirty seconds later, the RVR had increased to 5,500 feet. The aircraft was some six miles from the outer marker and was cleared to execute the ILS approach for Runway 16. This clearance was accepted by the crew.

At approximately 6:37 p.m., the aircraft reported on the frequency of the Westchester Tower, and the aircraft was issued clearance to land by the Local Controller. Additionally, the Local Controller advised the crew that the RVR was more than 6,000 feet and the ceiling was above the

minimum needed for landing. He also relayed a report from a Gulfstream II aircraft, which had successfully landed, of severe turbulence and some wind shear, including an increase of 20 knots in airspeed at 200 feet elevation on final approach. This information was acknowledged by the co-pilot when the aircraft was approximately seven miles from the end of the runway. The Local Controller then issued a report of winds from 190° at 20 miles per hour. This transmission was acknowledged promptly by Sorenson.

The Local Controller was watching the progress of the flight on the BRITE radar scope in the tower cab, it being the only plane he was landing at the time. Weather conditions prohibited the controller from visually seeing the aircraft. The aircraft was on a heading of 162° on a path with the runway.

At 6:38 p.m., the aircraft was approximately four miles from the end of the runway and, according to the BRITE scope, was established on localizer. The Local Controller again called to provide updated weather information to the crew: wind variable from 190° to 230° at 20 with gusts to 25, tower visibility seven-eighths of a mile, and runway visual range more than 6,000 feet. This advisory was acknowledged promptly by the crew, when the aircraft was approximately three miles from the end of the runway. This was the last communication received from N520S.

When the aircraft was approximately three miles from the end of the runway, it began to deviate from the localizer course. When the aircraft was approximately two miles from the end of the runway, the deviation was great enough to be detected by the Local Controller. The Local Controller called the aircraft to report new winds from 200° at 23 knots. The wind advisory was not acknowledged and the Local Controller was unable to establish radio contact with the aircraft. The aircraft thereafter resumed an overall heading of 162°, but remained about one-third

19. *See supra* note 18.

mile to the west of the localizer path, approximately paralleling it.

In its approach, the aircraft was at, or well above, the glide slope between the outer marker and a point two and one-half miles from the runway. In the next three-quarters of a mile, it went slightly below the glide slope. (As mentioned earlier, Westchester Traffic Control had no instruments to determine the plane's altitude.) The transponder radar returns, recorded by the FAA station on Long Island, indicate that the plane was more than 600 feet above runway altitude when the last return was received, before the plane fell below the distant radar's level. The aircraft was then less than two miles from the runway. In the next mile or less, it descended rapidly and, when still a mile from the runway, was only slightly above airport elevation.

The aircraft crashed at approximately 6:40 p.m. EST on an uninhabited wooded peninsula in Rye Lake (which is part of Kensico Reservoir) approximately 2,300 feet right of the localizer course and approximately one mile northwest of the threshold of Runway 16, where the ground elevation is approximately 440 feet MSL—approximately the same as the runway. The aircraft hit trees with its left wing low, as if it were banking for a turn to the left. The aircraft plowed for hundreds of yards through tree tops before impacting with the ground on the side of a steep hill. The aircraft was demolished, the fuel burst into an intense fire and all on board were killed instantly.

When weather communications were not acknowledged by the plane, the Local Controller called the Approach Controller to inquire whether the aircraft had executed a missed approach. When the deviation from course was detectable by the Local Controller, he had not advised the aircraft of its position in relation to the localizer course. There was no specific duty imposed on him to give an advisory of course deviation to the crew. Normally, a controller will not advise an aircraft on an instrument approach of its position in relation to the localizer, in the absence of a request or reported malfunctions. The crew had given no indication that any unusual air traffic services would be necessary.

Even if the observation of deviation from the localizer had been added to the last wind advisory, or had been given instead of the wind advisory (and we do not find that the circumstances of this case warrant such an advisory), the crew would not have heard the advisory in time for it to be useful.

The accident was caused by a loss of altitude when the plane was between one and two miles from the end of the runway. Westchester Air Traffic control was unaware of this loss of altitude, was not advised of it by the ship's crew, and had no other means of determining the altitude of the plane. The deviation from the localizer course was not the cause of the crash.

CONCLUSIONS OF LAW

Jurisdiction for the claims of the plaintiffs against the United States of America is founded upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671, et seq. (1982). A trial by the court without a jury is required for any action brought under the FTCA. 28 U.S.C. § 2402 (1982). Thus, the claims against the United States were tried to the Court.

The plaintiffs sought the use of an advisory jury under Fed.R.Civ.P. 39(c), since a jury was determining the respective liability of the other defendants. This application was denied. The law is clear that the Court must allocate the fault, if any, of the United States. 28 U.S.C. § 2402 (1982). As has been noted by other courts faced with this issue, the opinion of an advisory jury is of little use if they agree with the court. If their verdict were to differ from that of the court, it would be impossible to give effect to it. *See, e.g., In re Air Crash Disaster at Metropolitan Airport, De-*

*troit, Michigan on January 19, 1979*, 619 F.Supp. 13 (E.D.Mich.1984).[20]

Under the FTCA, the choice of law rules of New York apply because the government's alleged wrongful acts or omission occurred in New York. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); 28 U.S.C. §§ 1346(b) and 2674 (1982). A New York court would apply its own law to all liability issues because the air traffic controllers were located, the crash occurred, and the aircraft was attempting to land in New York. *See Cousins v. Instrument Flyers, Inc.*, 44 N.Y.2d 698, 376 N.E.2d 914, 405 N.Y.S.2d 441 (1978).

Under the law of New York, the plaintiffs must prove that the conduct of the controllers fell below the standard established by law for the protection of others against unreasonable risks. The plaintiffs must prove a legal duty on the part of the United States, a negligent breach of that duty, and resulting injury proximately caused by the negligent breach.[21] *Sawyer v. United States*, 297 F.Supp. 324, 337–38 (E.D.N.Y.1969); *aff'd*, 436 F.2d 640 (2d Cir. 1971); *Barr v. County of Albany*, 69 A.D.2d 914, 415 N.Y.S.2d 471, 473 (3d Dep't 1979). However, the plaintiffs' burden of proof is less since these are wrongful death actions. *Noseworthy v. City of New York*, 298 N.Y. 76, 80 N.E.2d 744 (1948). If the plaintiffs prove that the air traffic controllers' failure to exercise due care was a substantial contributing factor in the air crash, the government is liable. *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227 (2d Cir.), *cert. denied sub nom., United States v. Ingham*, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967).

The plaintiffs' allegations of negligence were based on the failure of the Approach Controller to inform the Local Controller that the aircraft had an equipment mal-function and the failure of the Local Controller to advise the aircraft that it was right of the localizer course. We find that the controllers were not negligent. Moreover, even if their inaction be considered negligence, it was not a proximate cause of the crash.

Initially, the plaintiffs failed to meet their burden of proof that the actions (or inactions) of the controllers at the Westchester County Tower constituted negligence. The Approach Controller was not negligent in failing to inform the Local Controller of the aircraft's equipment malfunction. While a controller is required to relay to subsequent controllers information pertaining to equipment failures, the pilots never mentioned any serious or permanent problems aboard the aircraft. Even assuming that the pilot had reported he had lost his right side radio, that report did not trigger the application of any provision in the Air Traffic Control Manual or otherwise alert air traffic control to any emergency about the aircraft.

The pilots were required, by Federal Aviation Regulations, to report to the controllers any loss of equipment that would affect their ability to fly the instrument approach, 14 C.F.R. § 91.129 (1984), or *any* information that pertained to the safety of flight, 14 C.F.R. § 91.125(c) (1984). A pilot must know and abide by the Federal Aviation Regulations. *In re Air Crash Disaster at New Orleans (Moisant Field), Louisiana, on March 20, 1969*, 422 F.Supp. 1166, 1175 (W.D.Tenn.1975), *aff'd*, 544 F.2d 270 (6th Cir.1976). If the aircraft was experiencing the serious electrical malfunctions claimed by some parties (and as the jury implicitly found), the crew was derelict in failing to advise Air Traffic Control of these problems specifically.[22] Fur-

---

**20.** An advisory jury would be of assistance only in the situation where both fact finders find the government partially responsible, in which case the jury's advisory verdict would help harmonize its proportioning of liability with other defendants.

**21.** An act or omission is a proximate cause of an injury if it was a substantial factor in bringing about the injury. *Estate of Finn v. City of New York*, 76 Misc.2d 388, 350 N.Y.S.2d 552, 556 (N.Y.App.Term.1973).

**22.** It is well-settled that the Federal Aviation Regulations have the force and effect of law,

thermore, good judgment would have dictated that the crew advise air traffic control of the fact that electrical problems had been and might again be encountered. It would have been essential for the crew to communicate any occurrence of electrical malfunction on the final leg of the approach to air traffic control if they were capable of doing so. However, at no time did the crew report any malfunction of equipment or instrumentation that would prevent it from complying with the requested air traffic control clearance to execute the ILS approach and landing. The Westchester Tower controllers, therefore, had the right to assume that the crew had the capability of complying with these clearances. *See Kiester v. United States*, 18 Av.Cas. (CCH) 17,101 (S.D.Fla.1983).[23]

Once the aircraft accepted the clearance to execute the ILS approach, the flight proceeded in a normal fashion until the loss of altitude and the crash. All aircraft communications proceeded without interruption and every transmission to the crew was promptly acknowledged. In light of this, even if the Approach Controller had relayed to the Local Controller the report of loss of the right side radio, it would not have had any significance to the Local Controller.

 Turning to the fact that the Local Controller failed to advise the crew of the aircraft that they were to the right of the localizer, and proceeding further away,

there was no negligence on the part of the Local Controller. First, it is noted that there is no Manual provision that requires a controller to advise a pilot on an instrument approach of his position in relation to the localizer, absent some request from the pilot that this information be provided. The evidence demonstrated clearly that once a pilot seeks a clearance to execute an instrument approach, the controllers have the right to expect that the pilot has the necessary equipment and capability to comply with the clearance to execute the instrument approach and landing without guidance from the tower.[24] Indeed, the evidence established that directional information volunteered by the tower at this stage of the landing would be a distraction to the pilot. Moreover, the Local Controller noticed that the aircraft had deviated from the localizer approximately two miles from the end of the runway, and attempted to contact the aircraft to provide it with updated wind information. The aircraft never acknowledged this transmission, and subsequent attempts by the Local Controller to establish radio contact with the aircraft were to no avail. The time elapsed between noting the deviation of the aircraft and the crash appears to have been less than half a minute. There is nothing in the evidence to establish that, had the Local Controller advised the crew of its position in relation to the localizer course, the crew would have heard this transmission and had time to respond to it.[25]

*Tilley v. United States*, 375 F.2d 678, 680 (4th Cir.1967); *United States v. Schultetus*, 277 F.2d 322, 327 (5th Cir.), *cert. denied*, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960); *Bandy v. United States*, 492 F.Supp. 13, 21 (W.D.Tenn.1978), *aff'd*, 628 F.2d 935 (6th Cir.1980), and violation of the FARs is evidence of negligence, *see In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975*, 635 F.2d 67, 75–76 (2d Cir.1980); *Citrola v. Eastern Air Lines, Inc.*, 264 F.2d 815, 817 (2d Cir.1959).

**23.** By Federal Aviation Regulation, Captain Gregory was fully responsible as a matter of law for the safety of his aircraft. 14 C.F.R. § 91.3 (1984). While the duties of pilots and controllers under certain circumstances may be concurrent, *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir.1972), the ultimate responsibility for the safe execution of an approach and

landing in a manner consistent with Federal Aviation Regulations rests with the crew of the aircraft, *Spaulding, supra*, 455 F.2d 222; *American Airlines, Inc. v. United States, supra*, 418 F.2d 180; *United States v. Schultetus, supra*, 277 F.2d 322; *In re Air Crash Disaster at New Orleans (Moisant Field), Louisiana, on March 20, 1969*, 422 F.Supp. 1166, 1176 (W.D.Tenn.1975), *aff'd*, 544 F.2d 270 (6th Cir.1976);

**24.** There are instrument landing systems, used primarily by the military, where the ground controller guides the plane onto the runway. This was not such a system.

**25.** If the aircraft sustained a serious electrical malfunction with complete loss of all power, the aircraft would be unable to hear and respond to air traffic control instructions. If the aircraft

Finally, it was not the directional deviation that caused the plane to crash. The accident was caused by the aircraft flying at too low an altitude. The controllers at the Westchester County Tower had no altitude information available to them, other than what might be provided by the pilots. (The only information available on their radar scopes was aircraft position in relation to the final approach course.) The plane should have been several hundred feet higher. Had it been only a hundred feet higher, it would not have crashed on the peninsula it struck and, had it maintained such an altitude, it could have reached the runway without encountering other hills. While the lengthy jury trial involved a number of different theories to explain the crash, under none of them were the air traffic controllers responsible for the loss of altitude or the crew's inability or failure to recognize it.

■ The plaintiffs have failed to meet their burden of proof of negligence on the part of the United States, and, specifically, have failed to prove any negligence whatsoever which proximately caused this accident.

Judgment shall be entered in favor of the United States of America in all of the actions in which it is a defendant or third-party defendant. This decision closes the following actions entirely: *Morgan Guaranty Trust Co. v. United States,* No. 82 Civ. 6296; *Woodling v. United States,* No. 82 Civ. 6297; *Claydon v. United States,* No. 82 Civ. 6459; *McKee v. United States,* 83 Civ. 1082; *Drew v. United States,* No. 83 Civ. 1083; and *Boyle v. United States,* 83 Civ. 5323. Costs shall be awarded to the United States in those actions.

SO ORDERED.

lost its electrical power and was flying in the dark without instruments and in instrument conditions, but had radio reception, being advised that the aircraft was right of course would

have been of little assistance. If the aircraft had electrical power, the crew had information available to it that their aircraft was right of localizer.